# Exhibit B

IN THE MATTER OF ARBITRATION

Between

Johns Manville Corporation
Cleburne, TX

And

GMP Council of the USW

Case No. 180118-00603
Issue:  Discipline/ Termination

Before

Russell E. Bergstedt, Jr.
Impartial Arbitrator

Opinion and Award of the Arbitrator

<u>Time and Place of Hearing</u>
8:30 am Hampton Inn
Cleburne, Texas

1

ARBITRATION AWARD

In the Matter of:

GMP Council of the USW

And

Johns Manville Corporation

FOR THE UNION:

          Brenda Scotland
          GMP Council Vice President

FOR THE COMPANY:

          Lauren Alexandra Polk
          Employment Counsel

IMPARTIAL ARBITRATOR:

          Russell E. Bergstedt, Jr.
          Plano, TX

By the terms of the agreement between Johns Manville, hereinafter referred to as the "Company" and the GMP Council of the USW, hereinafter referred to as the "Union" Russell E. Bergstedt, Jr. was selected by the parties to serve as impartial arbitrator. A hearing was held in Cleburne, TX, on November 30, 2018. Full opportunity was afforded the parties for the introduction of evidence, examination and cross-examination of witnesses, and oral arguments. These proceedings were declared closed on November 30, 2018. Post hearing briefs were submitted February 4, 2019.

STATEMENT OF FACTS:

- The Grievant, Glenn Pruitt, worked as an Inspector Packer at the Johns Manville Cleburne, Texas facility.

- The Grievant was employed for approximately eleven (11) years and four (4) months prior to his termination.

- Johns Manville has a posted Workplace Harassment Policy that has been in place throughout the Grievant's employment.

- The Grievant received live Mandatory Respectful Workplace Training in March 2008.

- Subsequent training on Company policies, rules and guidelines has been conducted utilizing computer based training modules.

- The Grievant was recorded making sexual comments referring to his genitals and sexual acts with a prostitute.

- An audio/ video recording was secretly made of the comments in one of the facilities break rooms.

- In August of 2017, anonymous employees from the Cleburne facility telephoned the Berkshire Hathaway hotline regarding potential violations of the Workplace Harassment Policy.

- The Grievant was named in one of the complaints.

- In response to the complaints, Shirley Vawter, Director of HR for North American Operations assembled a team of HR professionals to investigate the allegations.

- The team interviewed sixty (60) employees.

- During the interviews, employees reported the Grievant made sexually explicit statements.

- After conducting the interviews, the secretly recorded audio/ visual recording was provided to the investigative team.

- The Grievant was identified as making sexually explicit statements.

- The Grievant acknowledged making sexually explicit comments in the break room.

- The Company determined the Grievant had committed a serious violation of the Workplace Harassment Policy.

- Following the investigation, the Grievant was suspended.

- Ms. Vawter testified that in every situation that was escalated to her where an employee violated the Workplace Harassment Policy, the Company terminated the employee's employment.

- Glenn Pruitt was terminated from employment on September 29, 2017 for violation of Critical Rule #5.

COMPANY POSITION:

    The Company offers it has policies prohibiting discrimination in the workplace including the Workplace Harassment Policy in order to fulfill its obligation under the

law. The Company noted it is required under both Title VII and Texas law to provide a workplace free of harassment based on race, sex, or other protected status.

Aside from avoidance of potentially significant liability under federal and state law, the Company established its Workplace Harassment Policy because it values its employees and wants them to be able to work in an environment where they feel comfortable and can be productive.

The Company presents that nothing in the CBA requires progressive discipline, rather the CBA provides that management maintains all management rights including the "right to maintain discipline among employees." The Company has established the "Guidelines for Disciplinary Counseling/Corrective Action." These guidelines set forth management's right with respect to discipline.

Management maintains the right to terminate any employee for a serious violation of plant rules, regulations, requirements, procedures and practices. In addition, management retains the right to skip disciplinary progression based on the severity of the infraction. The guidelines further state that "Critical Plant Rules are those that if violated would normally result in immediate termination of employment." Critical Plant Rule #5 provides: Provoking, fighting, retaliating or committing any act of violence, harassment or discrimination against any person; this includes threatening, coercing, intimidating or interfering with fellow employees (encompasses JM Harassment, Discrimination & Workplace Safety Policies). Accordingly, the Company offers it has the discretion and right to determine whether a violation of a Critical Plant Rule is serious such that immediate termination of employment is warranted. Further, the Company states, JM vigorously enforce all reported violations of the Workplace Harassment Policy.

The Company noted that during the live Respectful Workplace training, instructors read through each of the policies, to include Workplace Harassment, Equal Employment/Anti-retaliation Policy, Use of Communications Policy and Cooperation in Investigations Policy, and ensured employees have access to a copy of the policies. During the live training sessions, all employees were provided examples of conduct that is inappropriate and violates JM policy. The Respectful Workplace training specifically recognized comments about sex life as examples of verbal conduct that violates the policy.

Noting that in August 2017, anonymous employees from the Cleburne facility telephoned the hotline regarding potential violations of the Workplace Harassment policy by three (3) individuals that worked at the plant, the Company commenced an investigation. A team of HR professionals headed by Director of HR for North American Operations, Shirley Vawter, interviewed sixty (60) employees. During the interviews the Company offered that employees reported the Grievant's made sexually graphic comments. After conducting the interviews, an audio/visual recording was provided to the investigative team in which an individual, identified as the Grievant, can be heard making sexually explicit statements. The Company stipulates that upon being confronted with the audio/visual recording the Grievant admitted to making the comments. The Company further stipulates, the Grievant was accompanied by two (2) Union representatives.

The Company offers the uncontroverted evidence demonstrates the Grievant made the sexually explicit comments admitted he was aware of the Workplace Harassment Policy and the Company conducted an impartial and thorough investigation.

The Company challenges testimony offered by the Union that employees were denied representation during the investigation and the disciplinary suspension was a suspension for retaliation.  The Company presents, the only grievance at issue in this matter, is regarding the termination of the Grievant's employment for violation of Critical Plant Rule 5.  The Company feels it has responded to all information requested by the Union.

The Company addressed the Union's understanding of the practice of notifying an individual when a comment or action is making them uncomfortable, unsafe or harassed. The Company points to the language in the policy that lays out options including the option to use the toll-free hotline.  The Company provides there is simply no requirement employees must inform the offender as a condition precedent to complaining to a supervisor, human resources, the hotline or any other avenues set forth in the policy.

The Company concludes, Johns Manville has zero tolerance for workplace harassment including sexually related conduct of a verbal nature that creates an intimidating, hostile, seductive or offensive work environment.  The Company feels the policy prohibits any discussion of sexual acts in the workplace regardless of whether they offend another individual.  The Company expresses the grievance must be denied because Johns Manville had just cause and its decision was not arbitrary or in violation of the CBA.  The Company accordingly and respectfully seeks the grievance be denied.

UNION POSITION:

The Union is seeking a 'make whole' remedy for what it considers is an unjust termination.

The Union questions the training provided employees and points to the reoccurring turnover in management, including human resources, as creating an inconsistent culture with regard to training and the application of plant rules, guidelines and policies.  The Union offers that the Company could not provide training records while testifying they provide training, and offered that the Grievant received formal mandatory training in 2008 and none since then up to and prior to his termination.  Current LU President, Jason Campbell, offered testimony to there being no formal mandatory training on Respectful Workplace and former LU President, Wanda Morin, offered testimony to the last time formal training was given to employees at the Cleburne facility, prior to the Grievant's termination, was in 2008.  The Union identified the computer based training (CBT) sessions as falling short of addressing and not specific regarding Respectful Workplace but dealing more with workplace violence.  The Union noted that formal training was delivered after the Grievant's termination by an HR Manager from the Company's DeFiance, Ohio facility.

The Union notes that during the eleven plus years of employment at the Cleburne facility the Grievant maintained an excellent work record and an excellent attendance record.  Further, the Grievant was chosen by his peers to be their representative as Vice President of the LU, a position he held for eight (8) years up to the day of his termination.

The Union challenges the handling of the investigation, the subsequent suspension and ultimate termination. The Union presents that HR Manager, Larina Carter, called Mr. Pruitt at home while he was preparing to report to work and notified him he was suspended and to not report to work. The Union was not involved in the suspension discussion nor provided the reason for the suspension and conveys this is a violation of the CBA Article 15, Section1. The Grievant was not informed of the reason for the suspension and was told it was for his own good and that it was because of retaliation. The Union raises questions about the interviews conducted with union represented employees not being provided representation by the Company. Former LU President Morin testified it was normal practice that when interviewing investigations involving Union members the Union is notified prior to and is present to provide representation. The Union offers that during the Grievant's interview he asked the identity of his accuser and was denied that information.

The Union addressed the language that the Company labels as "offensive" being used by the entire Cleburne workforce including both hourly and management employees. Employee Jordan DeSpain testified he was present in the break room and participated in the conversation. In addition, DeSpain testified there were greater than ten (10) persons present and typically these break room discussions involve sexual and racial statements. He further testified the break room is used to watch television and movies on DVD's. When asked if he had received training on Respectful Workplace, he stated he had received training after Mr. Pruitt was terminated. He also testified that immediately after Mr. Pruitt was terminated the conversations in the break room changed however they are now back to what they were when the Grievant was employed. When

9

asked if management was aware of the discussions held in the break room, Mr. DeSpain responded with yes, and said that supervisors often joined in. The Grievant and Mr. DeSpain testified that conversations were quailed if there were females, guests or truck drivers present. They also testified people are allowed to sleep in the break room while on break. The Grievant testified the Company did not censure what they watched but noted they did not watch hard-core porn but did watch PG and R rated movies. LU President Campbell testified that "offensive" language is spoken by all, management and down. During the testimony, Ms. Vawter spoke about the team interviewing sixty (60) employees but the Union contends not one of the people present in the break room was interviewed, including Mr. DeSpain. To the Union this indicates that the person recording the conversation either never identified anyone other than LU Vice President Pruitt or the Company knowingly never intended to discipline anyone other than Mr. Pruitt.

The reporting of harassment changed in 2013 according to the Union as testified to by Mr. Pruitt, Mr. DeSpain, Mrs. Williams-Morin and Mr. Campbell. All testified the procedure for handling harassment was to let your offender know they were harassing you and stop it. This was the method in which all claimed to be trained to handle harassment issues. Mr. DeSpain testified that none of the people in the break room were aware they were being recorded and no one complained about the nature of the conversation. In fact, these types of conversations were contained to the privacy of those in the break room.

The Union concludes that the zero tolerance posture only applies to the hourly employees. The inadequate training created a culture of anything goes, it's okay to have

10

open discussions on any subject matter and watch PG and R rated movies. The Union points to the change in reporting harassment in 2013, years after the formal training conducted in 2008 and employees were not aware of nor notified of this change. The Union points to the lack of consistent leadership allowing lapses in formal training and allowing a culture to develop without enforcement of the rules and policies. The Company and management accepted the behavior in the smoker's break room.

The Union respectfully requests that the grievance be granted and the adjustment sought of a make whole remedy.

ANALYSIS:

The Company's right to discipline for cause is an established, recognized and accepted standard in labor- management relations. This right is recognized in the CBA Article 6- Management Rights.

In this case, the Company has the burden of proving proper cause or just cause for termination by a preponderance of the evidence. Just Cause requires the employer to have and publicize policies and rules, confirm employees are knowledgeable and aware of the rules and consequences for violating said rules, guidelines and policies, provide due process to include the processing of discipline and to conduct a fair and objective investigation to ascertain that rules were violated or broken, treat employees the same in similar situations and use corrective discipline before discharging an employee.

Did Glenn Pruitt violate Critical Rule 5/ Workplace Harassment, the rule for which his employment was terminated? Did the Company have just cause for the termination?

Once notified, by an anonymous call to the Berkshire Hathaway hotline, that there may be violations of the Workplace Harassment policy, the Company embarked on an investigation into the allegations. The investigation was headed by the Director of Human Resources for North American Operations working with a team of HR professionals. A review of the evidence reveals that the Company did an excellent job of identifying language considered offensive by the Company and attributing the sexually explicit language spoken to Glenn Pruitt. When confronted with the audio/ visual recording Mr. Pruitt admitted to being involved in the conversation in the smokers break room. The Company considered this to be a violation of Critical Rule 5/ Workplace Harassment. Pruitt was suspended and his employment terminated on September 29, 2017.

Just cause standards require that employees accused of a violation of rules, guidelines and policies are aware of the rules, guidelines and policies and aware of the consequences of violating any of the rules, guidelines or policies. While the Company points to the Workplace Harassment policy being posted and entered a record of formal training on Respectful Workplace policies back in 2008, Union witnesses testified that there has been no formal training since 2008 and only again following the termination of Glenn Pruitt in 2017. The Company offered that computer based training has been in place at the Cleburne facility but had difficulty providing training records specific to the Workplace Harassment policy and again Union witnesses testified the computer based training dealt mostly with workplace violence. To this arbitrator, computer based training is designed to satisfy regulatory and legal requirements rather than provide specific training as had occurred in 2008. Computer based training records can be

produced during an audit for certification or recertification under ISO 9000 audits, OSHA inspections or corporate safety and training records reviews. It does not fulfill the Company's obligation of ensuring employees are aware of the Company's rules, guidelines or policies nor does it allow for the interpersonal exchange of specific examples and the explanation of what to do in certain situations. The Grievant and other witnesses testified to their understanding of how harassment has been handled in the plant. While the Workplace Harassment provides options for reporting or addressing an issue of harassment between employees, the practice as described was for the person being harassed to confront the offender and inform the actions were unwelcome and to stop it. While the Company's policy does not require employees confront their offender the workforce was not under that understanding and points to the policy being changed in 2013 without the benefit of formal in-person training. The Grievant denied being familiar with procedures as defined in the revised Workplace Harassment Policy that became effective in July of 2013 and superseded the Workplace Harassment Policy dated July 2007.

Due process, the Union challenged the process involved in notifying the Grievant of his suspension. Specifically, that this information was handled with a phone call and not with a written notification to include the Shop Steward as outlined in Article 15, Section 1. From the hearing it was clear there is a significant amount of turnover in site management to include the human resources department. Typically, this leads to challenges for HR to procedurally administer the CBA and other Company rules, guidelines and policies. In addition, it can lead to an unstructured culture as to what is expected of the workforce and what is acceptable behavior. The language that was used

by the Grievant was very sexually explicit.  It was spoken during a conversation in the smokers break room where, according to witness testimony, the environment is very relaxed.  The Company would desire an enforceable compliant environment, where the language around sex and race is non existent, that environment did not exist in the smokers break room.  The 'Man Cave' mentality as described by several witnesses points to a break room environment where 'Shop Talk' is common, employees, both hourly and salaried, were free to watch PG and R rated movies on DVD's and sleep while on break, and does not provide the Company an opportunity to rely on the sexually explicit language used by the Grievant as grounds for a violation of the Workplace Harassment Policy.  Witness testimony reported that the language changed for a brief period of time following the termination but has returned to the same nature as existed prior to the Grievant's termination.

      Critical Plant Rule 5, Provoking, fighting, retaliating, or committing any act of violence, harassment or discrimination against any person; this includes threatening, coercing, intimidating or interfering with fellow employees (encompasses JM Harassment, Discrimination & Workplace Safety Policies).  At issue, what person did the Grievant provoke, fight, threaten, harass, coerce, intimidate or interfere with?  The Grievant's spoken words were normal conversation in the break room.  The other ten (10) plus employees present engaged in the conversation while one secretly recorded the statements.  I do not find a violation of Critical Plant Rule 5.  Given the rule includes the JM Harassment, Discrimination & Workplace Safety Policies, as discussed, these alone can not be deemed to satisfy the just cause standards.

The Company chose to move to termination rather than a progressive form of discipline once it learned there were confirmed allegations of what is considered to be 'offensive language', by any standard, spoken by employees at the Cleburne facility. While the Company has the right to make this determination and impose termination under provisions of the CBA, the decision requires it be supported by the requirements and standards of just cause, it does not.

AWARD:

Johns Manville's decision to terminate the employment of Glenn Pruitt is not supported by the requirements and standards as required under the provisions of Just Cause. The Grievance is sustained. The Grievant, Glenn Pruitt, will be reinstated to his employment and made whole.

The Arbitrator retains jurisdiction over this matter to resolve any disputes that may arise with respect to implementation of the terms of this award.

February 26, 2019  
Plano, Texas

_____

Russell E. Bergstedt, Jr., Arbitrator