IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOHNS MANVILLE, | § | |
| | § | |
| Plaintiff/Counter-Defendant, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:19-cv-00788-E |
| | § | |
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION AND LOCAL UNION NO. 216M, | § | |
| | § | |
| Defendant/Counter-Plaintiff. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are cross-motions for summary judgment regarding an arbitration award (Doc. Nos. 20 and 23). Plaintiff Johns Manville seeks to vacate an arbitration award requiring it to reinstate and make whole a fired employee. Defendant United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and Local Union No. 216M ("the Union") seeks to confirm the award. The Court denies Plaintiff's motion, grants the Union's motion, and confirms the arbitration award.

The facts in this case are largely undisputed. Johns Manville manufactures construction materials. Johns Manville and the Union entered into a collective bargaining agreement (CBA), which governed the terms and conditions of employment for all production and maintenance employees at Johns Manville's Cleburne Plant at the relevant time.

Glenn Pruitt was employed as an Inspector Packer at Johns Manville's Cleburne Plant. According to the Company's complaint, a co-worker recorded Pruitt making explicit sexual comments referring to his genitals and to sexual acts with a prostitute. Pruitt was also named by at least one anonymous employee who phoned the company's hotline regarding violations of a workplace harassment policy. Johns Manville conducted an investigation. In interviews,

employees reported that Pruitt made sexually explicit statements. The secretly recorded audio/visual recording was provided to investigators. The recording confirmed Pruitt had made sexually explicit statements. During his interview, Pruitt admitted making sexually explicit comments in the break room.

The company determined that Pruitt violated its workplace harassment policy. That policy, effective July 2013, provides:

> Johns Manville prohibits workplace harassment based upon any of the protected characteristics, including sexually related conduct of a physical, verbal or visual nature that creates an intimidating, hostile, seductive or offensive work environment; unwanted touching, patting, grabbing, repeated objectional sexual flirtations, propositions, suggestive comments, lewd jokes and display in the workplace of sexually explicit objects, drawings or photos. Of course, Johns Manville also prohibits any employee from making unwelcome sexual advances or requests for sexual favors when submission or rejection of such conduct is used as the basis for employment-related decisions.
>
> Violation of this policy will result in disciplinary measures against the offender and may result in termination of employment.

In addition, the Company has "Guidelines for Disciplinary Counseling/Corrective Action." There are "General Plant Rules" and "Critical Plant Rules." According to the Company's director of human resources, the critical rules are those the Company finds significant enough that it "could take immediate disciplinary action up to, and including, termination." Critical Plant Rule #5 prohibits "[p]rovoking, fighting, retaliating, or committing any act of violence, harassment or discrimination against any person; this includes threatening, coercing, intimidating or interfering with fellow employees (encompasses JM Harassment, Discrimination, & Workplace Safety Policies)." As a result of its investigation, in September 2017, Johns Manville terminated Pruitt's employment for violation of "Critical Plant Rule #5."

Article 6 of the CBA, titled "Management Rights," authorizes Johns Manville to "make reasonable rules, regulations, or policies to promote efficiency, safe practices, and proper conduct." Article 15 of the CBA, titled "Discipline and Discharge," gives the Company the right to discipline or discharge employees for "just cause." The CBA provides a four-step grievance procedure for resolving disputes between the Company and the Union. The Union can submit the matter to arbitration if it is not satisfied with the outcome of the grievance. The CBA provides that the arbitrator's jurisdiction is limited to "a decision or award which is not contrary to, and which in no way adds to, subtracts from or alters the terms" of the CBA. Further, the arbitrator can only reverse the Company's decision in matters regarding employee discipline, discharge, or change of status, when "it is found that the Company has acted arbitrarily and without just cause, or in violation of [the CBA]."

Pruitt filed a grievance after his termination, and the Union pursued the grievance to arbitration. An arbitration hearing was held in November 2018. In February 2019, the arbitrator issued an award ordering that Pruitt be reinstated and "made whole." Although the arbitrator concluded that Pruitt used language that was "very sexually explicit" during a conversation in the smokers break room, the arbitrator determined that Johns Manville's decision to terminate Pruitt was "not supported by the requirements and standards as required under the provisions of Just Cause." The following is taken from the analysis section of the written arbitration award:

> Just cause standards require that employees accused of a violation of rules, guidelines and policies are aware of the rules, guidelines and policies and aware of the consequences of violating any of the rules, guidelines or policies. While the Company points to the Workplace Harassment policy being posted and entered a record of formal training on Respectful Workplace policies back in 2008, Union witnesses testified that there has been no formal training since 2008 and only again following the termination of Glenn Pruitt in 2017. The Company offered that computer based training has been in place at the Cleburne facility but had difficulty providing training records specific to the Workplace Harassment policy and again

3

> Union witnesses testified the computer based training dealt mostly with workplace violence. To this arbitrator, computer based training is designed to satisfy regulatory and legal requirements rather than provide specific training as had occurred in 2008. . . . It does not fulfill the Company's obligation of ensuring employees are aware of the Company's rules, guidelines or policies nor does it allow for the interpersonal exchange of specific examples and the explanation of what to do in certain situations. The Grievant and other witnesses testified to their understanding of how harassment has been handled in the plant. While the Workplace Harassment provides options for reporting or addressing an issue of harassment between employees, the practice as described was for the person being harassed to confront the offender and inform the actions were unwelcome and to stop it. While the Company's policy does not require employees confront their offender the workforce was not under that understanding and points to the policy being changed in 2013 without the benefit of formal in-person training. The Grievant denied being familiar with procedures as defined in the revised Workplace Harassment Policy that became effective in July of 2013 and superseded the Workplace Harassment Policy dated July 2007.

The arbitrator further noted that it was clear there was significant turnover in the Company's site management, which included the human resources department. The report states that this typically leads to "challenges for HR to procedurally administer the CBA and other Company rules, guidelines and policies." It can also lead to an "unstructured culture as to what is expected of the workforce and what is acceptable behavior."

The arbitrator found that Pruitt's words were normal conversation in the smokers break room. According to witness testimony, the environment in the smokers break room was very relaxed. An environment where "language around sex and race is non existent" did not exist in the smokers break room. Several witnesses described a "man cave" mentality. "Shop talk" was common; employees were free to watch PG and R rated movies on DVDs. At the time Pruitt made the statement that was secretly recorded, more than ten other employees present engaged in the conversation, while one made the recording. According to the arbitrator, witnesses reported that the language changed briefly following Pruitt's termination, but had since returned to the "same nature as existed" prior to his firing.

The arbitrator found that Johns Manville could not rely on the explicit language used by Pruitt as grounds for violation of its Workplace Harassment policy. He therefore found no violation of Critical Plant Rule #5.

In this lawsuit, Johns Manville seeks to vacate the arbitration award on two grounds. It contends the arbitrator acted in excess of his authority and jurisdiction and contends the award violates public policy. The Union filed a counterclaim to enforce the arbitration award. Both parties have filed motions for summary judgment.

When, as here, an arbitration decision arises from the terms of a collective bargaining agreement, judicial review is narrowly limited. *Beaird Indus., Inc. v. Local 2298, Int'l Union*, 404 F.3d 942, 944 (5th Cir. 2005). Court should afford great deference to such an award. *Resolution Performance Prods., LLC v. Paper Allied Indus. Chem. & Energy Workers Int'l Union*, 480 F.3d 760, 764 (5th Cir. 2007). As long as the arbitrator's decision draws its essence from the CBA, and the arbitrator is not fashioning his "own brand of industrial justice," the award cannot be set aside. *Id.* at 764–65. Additionally, a court must affirm an award as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority. *Id.* at 765. Even where a court would interpret the contract differently, it must still affirm the award. *Id.* An arbitrator lacks authority to render a decision contrary to an unambiguous provision of the CBA. *Id.*

Johns Manville first contends that the arbitrator exceeded the scope of his authority as defined by the CBA and that he dispensed his own brand of industrial justice. The Company argues that the arbitrator found Pruitt engaged in the conduct for which he was fired. It argues that by excusing the conduct, the arbitrator exceeded the scope of his authority for two reasons. First he "subtracted from and altered the terms of the CBA by nullifying the Company's Anti-

5

Harassment Policy." Second, he reversed the Company's decision in matters involving the fairness of discharge without finding that the Company acted arbitrarily and without just cause, or in violation of the CBA.

"Just cause" is not defined in the CBA. The arbitrator was required to construe what constituted just cause. The CBA gave Johns Manville the right to "make reasonable rules, regulations, or policies" to promote proper conduct. In a separate article, it also gave the Company the right to terminate employment for just cause. The CBA does not provide that any violation of Johns Manville policy, or critical rules, necessarily constitutes just cause for termination. *See First Nat'l Supermkts., Inc. v. Retail, Wholesale & Chain Store Food Emp. Union Local 338*, 118 F.3d 892, 896 (2d Cir. 1997); *cf. General Drivers, Warehousemen & Helpers Local Union 968 v. Sysco Food Servs., Inc.*, 838 F.2d 794, 796 & n. 1 (5th Cir. 1988) (CBA expressly incorporated separate company rules into just cause provision; "Union recognizes the right of the Company to make and enforce Rules and Regulations and that violation thereof may be just cause for discipline or discharge"). It is a well-recognized principle that, except where expressly limited by a labor agreement, an arbitrator may consider the common law of the shop when interpreting ambiguous provisions. *Local No. 7 United Food & Commercial Workers Int'l Union v. King Soopers, Inc.*, 222 F.3d 1223, 1228 (10th Cir. 2000). The arbitrator was required to construe what just cause meant and therefore his award was a matter of contract interpretation within his authority. *See First Nat'l Supermkts.*, 118 F.3d at 896–97 (if employer wished to have unquestionable right to discharge employee for any specified conduct, it needed to negotiate for recognition of that right in CBA). Further, although the Company complains that the arbitrator's award does not explicitly state that the Company acted arbitrarily, the Court concludes that such a finding can be inferred from the conclusion that the Company acted without just cause. *See New Orleans Cold Storage*

6

*& Warehouse Co. v. Teamsters Local 270*, No. 17-56, 2017 WL 3521601, at *5 (E.D. La. Aug. 16, 2017).

Johns Manville also argues that the award violates public policy against sexual harassment. Well-established federal labor law favors the protection of an arbitration scheme of "private settlement of labor disputes without the intervention of the government." *Weber Aircraft, Inc. v. Gen. Warehousemen & Helpers Union Loc. 767*, 253 F.3d 821, 825 (5th Cir. 2001). There is a narrow legal exception that makes a CBA that is contrary to public policy unenforceable. *Id.* The Supreme Court has made clear that any such public policy must be explicit, well defined, and dominant. *Id.* at 825–26. The question is not whether Pruitt's conduct violates public policy, but whether the CBA, which—as interpreted by the arbitrator—provides for his reinstatement, violates public policy. *Id.* at 826. In *Weber*, the Fifth Circuit considered whether a CBA that allowed reinstatement of an employee who sexually harassed his female co-workers ran contrary to public policy. *Id.* The Fifth Circuit rejected the employee's public policy argument. *Id.* at 826–27. As in *Weber*, the Court cannot find in the laws, regulations, or any other law or legal precedent, an explicit, well defined, dominant public policy to which the arbitrator's decision runs contrary. *See id.*

The Union contends that it is entitled to attorney's fees. Under the "American Rule," litigants must pay their own attorney's fees absent statute or enforceable contract. *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015). Although the Federal Arbitration Act does not provide for attorney's fees to a party who is successful in confirming an arbitration award in federal court, the party seeking confirmation may nevertheless be entitled to attorney's fees if the opponent's reasons for challenging the award are without merit or justification. *Ennis, Inc. v. Gildan Activewear SRL*, No. 3:18-CV-0870-K, 2019 WL 3716426, at *1 (N.D. Tex. Aug. 6, 2019).

7

The Union argues that an award of attorney's fees is proper in this case. It contends the Company has, without justification, refused to abide by the arbitrator's award. The Union argues that, although Johns Manville couched its challenge to the award in terms of the arbitrator exceeding his authority and jurisdiction, the Company really disagrees with the arbitrator's fact findings and interpretation of the CBA.

The Company responds that it made legitimate arguments for refusing to enforce the award that go directly to whether the arbitrator stayed within his contractual boundaries or whether the decision drew its essence from the CBA. Even if the Court enforces the award, Johns Manville contends that its arguments were not "without justification."

After considering the record and the parties' arguments, the Court concludes that the Company's challenges to the arbitration award were not without justification and denies the request for attorney's fees. In summary, the Court grants the Union's motion for summary judgment, denies Johns Manville's motion for summary judgment, denies the Union's request for attorney's fees, and confirms the arbitration award in all respects.

**SO ORDERED.**

Signed August 26, 2020.

_____
ADA BROWN
UNITED STATES DISTRICT JUDGE